COURT OF APPEALS OF VIRGINIA

Present:   Judges Humphreys, Beales and McCullough
Argued at Alexandria, Virginia

JOSHUA DADZIE ANAMAN, S/K/A
 JOSHUA E. DADZIE-ANAMAN

                                                                                    OPINION BY
v.      Record No. 2465-13-4                          JUDGE RANDOLPH A. BEALES
                                                                              FEBRUARY 24, 2015

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
Louise M. DiMatteo, Judge

        Allison H. Carpenter, Senior Assistant Public Defender (Office of the
        Public Defender, on brief), for appellant.

        Elizabeth C. Kiernan, Assistant Attorney General (Mark R. Herring,
        Attorney General, on brief), for appellee.


        Joshua Dadzie Anaman (appellant) appeals his seven convictions by a jury for credit card

theft, in violation of Code § 18.2-192, and his four convictions for unlawful use of a card

scanning device or re-encoder, in violation of Code § 18.2-196.1.[1]  Appellant argues that the trial

court erred when it allowed into evidence a "Declaration of Unauthorized Use" form (Exhibit

5F) that one of the victims had completed after Citibank notified her that unauthorized charges

had appeared on her credit card.  Appellant further argues that the evidence was insufficient to

support any of his eleven convictions.  We hold that the trial court did not err when it allowed

Exhibit 5F into evidence – and that the evidence was sufficient to support each of appellant's

_____

        [1] Appellant was found not guilty of two counts of credit card theft and not guilty of one
count of unlawful use of a card scanning device.  Three of appellant's convictions for unlawful
use of a card scanning device were felonies, and one was a misdemeanor.

eleven convictions. Accordingly, for the following reasons, we affirm appellant's convictions for credit card theft and his convictions for unlawful use of a card scanning device or re-encoder.

## I. BACKGROUND

We consider the evidence on appeal "'in the light most favorable to the Commonwealth, as we must since it was the prevailing party'" in the trial court. Beasley v. Commonwealth, 60 Va. App. 381, 391, 728 S.E.2d 499, 504 (2012) (quoting Riner v. Commonwealth, 268 Va. 296, 330, 601 S.E.2d 555, 574 (2004)).

In this case, each of the victims rented a car from the Ronald Reagan Washington National Airport Budget Rental Car (Budget) branch sometime during August of 2011. Appellant began working for Budget on March 15, 2011, and stopped working for Budget on November 30, 2011. Shortly after renting a car from Budget, unauthorized charges would appear on each of the victims' credit cards or debit[2] cards that he or she had used to rent a car from Budget. The rental paperwork for each of the victims indicated that appellant, who was identified in the rental paperwork by his agent ID number,[3] had conducted the rental transaction for each of the victims. All of the victims who testified at trial indicated that they had not given appellant permission to withhold their credit card numbers or to use a card scanner to capture information from their credit cards.

---

[2] For purposes of the offenses at issue in this case, a debit card is treated the same way as is a credit card. See Code § 18.2-191.

[3] Diane Kees, a Budget employee, testified that each time a rental associate conducted a rental transaction, he or she was required to enter his or her agent ID number and PIN into the computer. Although employees would sometimes trade agent IDs and PINs with each other when, for example, an employee got locked out of a computer, Kees testified that agents generally would not have an incentive to share his or her agent ID and PIN with other employees because any commission goes to the person who is associated with the agent ID number – and not necessarily to the person who conducts the transaction.

## A.  The Card Scanning Device and Re-Encoder

Code § 18.2-196.1 defines "scanning device" as follows:  "a scanner, reader, or any other electronic device that is used to access, read, scan, obtain, memorize, temporarily store, or permanently store encoded information on the magnetic strip or stripe of a payment card."  Code § 18.2-196.1 further defines "Re-encoder" as follows:  "an electronic device that transfers encoded information from the magnetic strip or stripe of a payment card onto the magnetic strip or stripe of a different payment card."

Angel Ruiz, who is a detective with the airport police and had been investigating appellant's case, testified that card scanners "are portable devices that usually can be held in your hands and manipulated such that you don't have to – they're not visible to anybody else."  He further explained that card scanning devices "are small enough where they can fit in your palm" and that "all you have to do – you can actually walk by a woman's purse or a man's wallet and glide by their wallet or purse, and it will capture their credit card data."  Ruiz opined that card scanners "are probably used by individuals that are conducting some kind of criminal activity." Ruiz explained that a person can use the information obtained on a card scanning device in one of two ways:  (1) he or she can use the information obtained on the scanning device to make fraudulent purchases online, or (2) he or she can use a re-encoding device to transfer the information the scanning device has captured onto the magnetic strip of another card, such as an old credit card or a hotel key with a magnetic strip.  Ruiz testified that, during his interview with appellant, appellant stated that he used a card scanning device that required only a tap of a card to the device to capture all of the information associated with the card.

B.  The Cardholders Who Testified at Trial

M.M.[4] testified that he rented a car from Budget on August 14, 2011.  Although M.M. was not certain if his credit card was out of sight during the rental transaction, M.M. did recognize appellant as the rental associate who assisted him with the transaction.  In addition, M.M.'s Budget rental paperwork referenced appellant's agent ID number.  Shortly after M.M. rented his car from Budget, on August 16, 2011, unauthorized transactions appeared on the card that M.M. had used to rent his car.  Specifically, M.M.'s credit card was used to purchase a $500 gift card from Wal-Mart.

C.J. testified that she rented a car from Budget on August 12, 2011.  C.J. testified that the rental agent from whom she rented her car told her he was from Ghana, which is appellant's country of origin.  C.J.'s rental paperwork referenced appellant's agent ID number and, on August 13, 2011, just one day after renting a car from Budget, unauthorized charges of $1,300 appeared on the card that C.J. had used to rent her car.  C.J. testified that her credit card was out of sight during the transaction.

Another of the victims, P.W., rented a car from Budget on August 19, 2011.  On August 24, 2011 and on August 26, 2011, unauthorized charges totaling $752.12 appeared on the credit card he used to rent his car.  Although P.W. did not remember who assisted him with his rental transaction, his rental paperwork referenced appellant's agent ID number.  P.W. believed that the rental agent took his card out of his sight during the transaction.

D.L. testified that he rented a car from Budget on August 21, 2011.  Just a few days later, on August 24, 2011, unauthorized charges for gasoline appeared on the credit card he used to rent the car from Budget.  D.L. did not recognize the person who conducted his rental

---

[4] In order to protect the privacy of the victims, this opinion will not reference them by their full names.

transaction, but D.L.'s rental paperwork referenced appellant's agent ID number. D.L. recalled that his credit card was within his sight throughout the rental transaction.

J.N., yet another victim, testified that he had rented a car from Budget on August 7, 2011. Shortly thereafter, on August 13, 2011, unauthorized charges of $1,250 appeared on the debit card that J.N. had used to rent his car from Budget. Although J.N. did not recognize the person who processed his rental transaction, J.N.'s rental data referenced appellant's agent ID number. J.N. did not recall whether his debit card was within his sight at all times during the rental transaction.

Finally, E.V. testified that he rented a car from Budget on August 20, 2011. On August 30, 2011, unauthorized charges totaling $420.67 appeared on the card he used to rent the car. Video surveillance actually captured the rental transaction between E.V. and appellant. Appellant acknowledged that he was pictured in the video. E.V. could not recall whether his credit card was within his sight at all times during the transaction.

### C. Declaration of Unauthorized Use (Exhibit 5F)

Another victim, N.M., used her credit card to rent a car from Budget on August 18, 2011. The next day, on August 19, 2011, unauthorized charges appeared on N.M.'s credit card. N.M.'s rental paperwork from Budget referenced appellant's agent ID number.

At the time of trial, N.M. was not available to testify since she was away on a military tour of duty. Thus, the Commonwealth introduced Exhibit 5F, the Unauthorized Declaration of Use form, through Steven Bishop, a fraud investigator for Citibank. Bishop testified that Exhibit 5F was a record that was made and kept in the ordinary course of business, that it was made at or near the time the information was being reported to the bank, that he had knowledge of how it was maintained, and that he had access to Unauthorized Declaration of Use records as part of his job. When asked about the purpose of an Unauthorized Declaration of Use form, Bishop replied:

This is essentially a report from our cardholder to us declaring that there were certain unauthorized charges made on their credit card account. And so it's an affidavit or a declaration or a statement, whichever word you would like to use, indicating that in this particular case, that the cardholder's account was used without their permission . . . . [I]t generates a formal dispute by the cardholder with Citibank and allows us to begin to research the claim. And eventually the result is that we make the customer whole so that we reverse the charges off of the customer account.

N.M. had faxed her completed Unauthorized Declaration of Use form (Exhibit 5F) to Citibank on October 4, 2011. In the form, she alleged that her "account number was used in an unauthorized fashion," and stated that she "was informed by the Citibank fraud department on 19Aug11 that [her] card was used at Walmart. Total = $800." N.M. further indicated on the form that all of her credit cards were in her possession at the time of the fraudulent use. N.M. wrote "None" in response to the following prompt: "I have reason to believe the following individual(s) utilized or had access to my account without my authorization." She signed the bottom of the form, agreeing to the following statement: "I understand that Bankcard Security investigates alleged fraudulent or unauthorized credit card usage and may refer the same to the appropriate law enforcement agency. I agree to cooperate in the prosecution of individuals charged with fraudulent or unauthorized credit card usage." The form made no reference to either appellant or Budget.

At trial, appellant objected to the admission of Exhibit 5F on the ground that it was testimonial and that it was hearsay that did not fit within the business records exception to the hearsay rule. Appellant also argued below that certain statements contained within Exhibit 5F constitute hearsay within hearsay, including the statement that "I was informed by the Citibank fraud department on 19Aug11 that my card was used at a Walmart. Total = $800."[5]

_____

[5] While appellant did argue below that certain statements contained within Exhibit 5F constitute hearsay within hearsay, see Rule 5A:18, we do not address appellant's hearsay within hearsay argument on appeal because appellant did not include that argument within any of his

D. Appellant's Confession

On December 15, 2011, police officers executed a search warrant at appellant's residence. Appellant was read his Miranda rights and acknowledged that he understood his rights and that he was willing to waive his rights. After an interview with the police, appellant produced a written statement summarizing what he had said to police. In that written statement, appellant explained that a man named Dre had approached him during a work break. According to appellant, Dre had given appellant a card scanning device, and had promised to "take care of" appellant as long as he gave Dre information that he obtained by using the scanning device. After his initial meeting with Dre, appellant approached Dre a few days later and "insisted there was nothing on it [the card scanning device]." Dre then gave appellant further instructions on how to use the card scanning device. Appellant eventually met Dre a third time, and gave the device back to Dre. In his written statement, appellant said that he "did a couple transaction [sic] for [Dre]." Appellant said that he never saw Dre again, and Dre never followed through on his promise to "take care of" appellant.

At trial, appellant denied the veracity of his confession. He testified that he had told officers that he had never seen a card scanning device in his life, that he only cooperated with police because he feared that, if he did not do so, they would deport him to Ghana, that he did not know anybody by the name of Dre, and that the police forced him to make a statement.

II. ANALYSIS

A. Unauthorized Declaration of Use (Exhibit 5F)

Appellant's first assignment of error challenges the admission of Exhibit 5F on both hearsay and Confrontation Clause grounds. "It is well settled that '[t]he admissibility of

assignments of error. See Rule 5A:12(c)(1)(i) ("Only assignments of error assigned in the petition for appeal will be noticed by this Court.").

evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion.'" Wood v. Commonwealth, 57 Va. App. 286, 304, 701 S.E.2d 810, 818 (2010) (quoting James v. Commonwealth, 18 Va. App. 746, 753, 446 S.E.2d 900, 904 (1994)). To the extent that appellant's first assignment of error presents a question involving constitutional interpretation, we apply a *de novo* standard of review. See Gallagher v. Commonwealth, 284 Va. 444, 449, 732 S.E.2d 22, 24 (2012) (citing Montgomery County v. Virginia Dep't of Rail & Pub. Trans., 282 Va. 422, 435, 719 S.E.2d 294, 300 (2011)).

The Supreme Court has explained the business records exception to the hearsay rule as follows:

> "In Virginia, the business records exception to the hearsay rule, also referred to as the 'modern shop book rule,' permits the admission of verified regular entries of a business provided that such evidence has a direct or circumstantial guarantee of trustworthiness. We have further explained that the trustworthiness or reliability of such records is guaranteed by the fact that they are regularly prepared and relied on in the conduct of business by the persons or entities for which the records are kept. Therefore, to be admissible as a business record, a document must be produced by its proper custodian, be a record kept in the ordinary course of business, and be made at the time of an event by a person having a duty to keep a true record of that event."

Stokes v. Commonwealth, 49 Va. App. 401, 409, 641 S.E.2d 780, 784 (2007) (quoting 1924 Leonard Rd., L.L.C. v. Van Roekel, 272 Va. 543, 554-55, 636 S.E.2d 378, 385 (2006)). In addition, Rule 2:803(6) provides, in relevant part, that:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness: . . . (6) Business records – A memorandum, report, or data compilation, in any form, of acts, events, calculations or conditions, made at or near the time by, or from information transmitted by, a person with knowledge in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make and keep the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

Thus, the record may be authenticated by the testimony of the custodian or any "other qualified witness." Id.; see McDowell v. Commonwealth, 48 Va. App. 104, 109, 628 S.E.2d 542, 545 (2006), aff'd, 273 Va. 431, 641 S.E.2d 507 (2007); Lee v. Commonwealth, 28 Va. App. 571, 576, 507 S.E.2d 629, 632 (1998).

The trial court did not abuse its discretion when it admitted Exhibit 5F as a business record. At trial, Bishop indicated that Exhibit 5F was made and kept in the ordinary course of business, that it was made at or near the time the information contained within it was being reported, that he had knowledge of how Unauthorized Declaration of Use forms are maintained, and that he had access to Unauthorized Declaration of Use forms as part of his job duties. Receipt of the Declaration of Unauthorized use form would generate a formal dispute between the cardholder and Citibank and would "allow[] [Citibank] to begin to research the claim." After researching the claim, Citibank would generally "make the customer whole" by removing the unauthorized charges from the cardholder's account. Because Citibank relied on Unauthorized Declaration of Use forms when deciding whether to credit a customer's account, because such forms were kept in Citibank's ordinary course of business, and because they were timely completed, Declaration of Unauthorized Use forms in general and Exhibit 5F in particular constitute business records.[6] See 1924 Leonard Rd., L.L.C., 272 Va. at 554-55, 636 S.E.2d at

---

[6] Appellant argues that this case is distinguishable from Stokes, where this Court held that the "affidavits of forgery" in that case fit within the business records exception to the hearsay rule. 49 Va. App. at 409, 641 S.E.2d at 784. In that case, the Vice President of the bank met with the victim and had him complete "affidavits of forgery." Id. at 405, 641 S.E.2d at 782. The Vice President of the bank in Stokes explained that the bank typically used the "affidavits of forgery" to investigate fraudulent transactions and that, in that particular case, the bank lost money as a result of crediting the money back to the victim after the victim had completed the affidavits of forgery. Id. Appellant attempts to distinguish Stokes on the ground that the bank Vice President in that case assisted the victim by helping her to complete the affidavits of forgery. Here, unlike in Stokes, N.M. did not receive any assistance from a bank official when she completed the Declaration of Unauthorized Use form. This distinction is immaterial – just because the customers complete the Declaration of Unauthorized Use forms does not mean that Exhibit 5F falls outside of the business records exception to the hearsay rule. Regardless of who

385. Moreover, given that Unauthorized Declaration of Use forms are created for business purposes alone, the trial court's admission of Exhibit 5F did not violate appellant's Confrontation Clause rights.

The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The United States Supreme Court has explained that the Confrontation Clause prohibits "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Crawford v. Washington, 541 U.S. 36, 53-54 (2004). "'Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation.'" Crawford v. Commonwealth, 281 Va. 84, 97-98, 704 S.E.2d 107, 115 (2011) (quoting Crawford v. Washington, 541 U.S. at 68-69). Thus, "[i]f the statement is found to be testimonial, 'the Sixth Amendment demands what the common law required: [in-court confrontation or] unavailability and a prior opportunity for cross-examination.'" Crawford, 281 Va. at 97, 704 S.E.2d at 115 (quoting Crawford v. Washington, 541 U.S. at 68).

The United States Supreme Court has clarified what constitutes a "testimonial" statement:

> Ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements . . . contained in formalized testimonial materials such as affidavits, depositions, prior testimony, or confessions; statements that were made under

---

completes the information contained within the form, Citibank prepared the forms and the questions in them (and, thus, required certain information to be provided), then relies on the forms in the transaction of its ordinary business affairs, and the forms are kept in the ordinary course of business. See 1924 Leonard Rd., L.L.C., 272 Va. at 554-55, 636 S.E.2d at 385.

circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

541 U.S. at 51-52 (internal quotation marks and citations omitted). In addition,

"Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."

Crawford, 281 Va. at 98, 704 S.E.2d at 116 (quoting Davis v. Washington, 547 U.S. 813, 822 (2006)). As the Virginia Supreme Court has explained,

Crawford and Melendez-Diaz . . . made it clear that the admission of documentary evidence in lieu of the live testimony of witnesses violates a criminal defendant's confrontation rights under the Sixth Amendment, if the documents are testimonial in nature, because such documents cannot be tested "in the crucible of cross-examination."

Walker v. Commonwealth, 281 Va. 227, 231, 704 S.E.2d 124, 126 (2011) (quoting Crawford, 541 U.S. at 61). The admission of non-testimonial documentary evidence, however, "does not offend the confrontation clause. *Business and public records, for example, are not testimonial because they are created for the administration of affairs generally 'and not for the purpose of establishing or proving some fact at trial.'*" Id. (quoting Melendez-Diaz v. Massachusetts, 557 U.S. 305, 324 (2009) (emphasis added)).

Both the testimony of Steve Bishop and the content of Exhibit 5F make clear that the primary purpose of Exhibit 5F was *not* "to establish or prove past events potentially relevant to later criminal prosecution." Davis, 547 U.S. at 822. As explained, *supra*, Citibank relied on Declaration of Unauthorized Use forms to initiate fraud investigations and to decide whether to credit a customer's account. No part of Bishop's testimony indicated that Declaration of

- 11 -

Unauthorized Use forms were generated so that they could be later used in a criminal prosecution.

The content of the Declaration of Unauthorized Use form also suggests that it is a non-testimonial document. In response to the prompt on the form stating, "I have reason to believe the following individual(s) utilized or had access to my account number without my authorization," N.M. wrote "none." N.M. never mentioned either appellant or Budget anywhere on the Declaration of Unauthorized Use form. The boilerplate language at the end of the form – stating "I understand that Bankcard Security investigates alleged fraudulent or unauthorized credit card usage and may refer the same to the appropriate law enforcement agency. I agree to cooperate in the prosecution of individuals charged with fraudulent or unauthorized credit card usage" – does not render the Declaration of Unauthorized Use form testimonial. Nothing in this boilerplate language indicates that the Declaration of Unauthorized Use form *itself* is created so that it can be used in a later criminal prosecution. Thus, Bishop's testimony and the content of the form establish that Exhibit 5F is non-testimonial because it was not prepared to be used in a later criminal prosecution.

### B. Sufficiency of the Evidence

Appellant's second and third assignments of error challenge the sufficiency of the evidence to support his credit card theft convictions and his use of a card scanning device or re-encoder convictions. When considering the sufficiency of the evidence on appeal, "a reviewing court does not 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" Crowder v. Commonwealth, 41 Va. App. 658, 663, 588 S.E.2d 384, 387 (2003) (quoting Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)). "Viewing the evidence in the light most favorable to the Commonwealth, as we must since it was the prevailing party in the trial court," Riner, 268 Va. at 330, 601 S.E.2d at 574, "[w]e must instead

ask whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,'" Crowder, 41 Va. App. at 663, 588 S.E.2d at 387 (quoting Kelly v. Commonwealth, 41 Va. App. 250, 257, 584 S.E.2d 444, 447 (2003) (*en banc*)). See also Maxwell v. Commonwealth, 275 Va. 437, 442, 657 S.E.2d 499, 502 (2008). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319.

Code § 18.2-192(1)(a) provides, in relevant part, that:

> A person is guilty of credit card or credit card number theft when: He takes, obtains or withholds a credit card or credit card number from the person, possession, custody or control of another without the cardholder's consent or who, with knowledge that it has been so taken, obtained or withheld, receives the credit card or credit card number with intent to use it or sell it, or to transfer it to a person other than the issuer or the cardholder.

Code § 18.2-196.1(A) provides that "[a]ny person who with malicious intent uses a scanning device or a re-encoder on the payment card of another without the permission of the authorized payment card user is guilty of a Class 1 misdemeanor." In addition, Code § 18.2-196.1(B) provides that "[a]ny person who violates this section and sells or distributes such information to another is guilty of a Class 6 felony."

Viewing the evidence in the light most favorable to the Commonwealth (as we must since it was the prevailing party at trial), a rational trier of fact could find appellant guilty beyond a reasonable doubt of both credit card theft and unlawful use of a card scanning device or re-encoder. In a circumstantial evidence case, such as this one, the "combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion." Dowden v. Commonwealth, 260 Va. 459, 470, 536 S.E.2d 437, 443 (2000). Here, the combined force of several circumstances in the record suggests that a finder of

- 13 -

fact reasonably could have found appellant guilty of seven counts of credit card theft and four counts of unlawful use of a card scanning device or re-encoder.

Appellant confessed in a written statement to police that he used a card scanning device and "did a couple transaction [sic] for [Dre]." "'[S]light corroboration of the confession is required to establish corpus delicti beyond a reasonable doubt.'" Allen v. Commonwealth, 287 Va. 68, 74, 752 S.E.2d 856, 860 (2014) (quoting Cherrix v. Commonwealth, 257 Va. 292, 305, 513 S.E.2d 642, 651 (1999)). The slight corroboration, however, "need not be 'of all the contents of the confession, or even all the elements of the crime.'" Id. (quoting Watkins v. Commonwealth, 238 Va. 341, 348, 385 S.E.2d 50, 54 (1989)). In this case, an overwhelming amount of evidence corroborates appellant's confession.

Appellant's agent ID appeared on the Budget rental paperwork of all of the victims. Appellant contends that other agents could have used his agent ID to conduct the transactions, but this argument is unpersuasive. As Diane Kees, the Budget employee who testified in this case, explained, employees generally do not have an incentive to use the agent ID of another employee since any commission is given to the Budget employee whose agent ID number is associated with the transaction. Although appellant did share his agent ID with other employees on some occasions, additional circumstances and evidence – each mounting upon the other – foreclose the possibility that another employee conducted the transactions at issue.

First, beyond considering just appellant's agent ID number, additional evidence amply points to appellant's presence at the rental car transactions with many of the victims. One of the victims, M.M., positively identified appellant. Another of the victims, C.J., testified that the Budget rental agent who had rented her the car also told her that he was from Ghana – which is appellant's country of origin. Moreover, appellant actually identified himself as the one who was conducting the transaction with E.V. that the surveillance camera captured.

Second, in each case, the fraud occurred within just a few days of the rental transaction.

Third, because appellant needed only to tap a credit card against his very small card scanning device to obtain information, the fact that a number of the witnesses either could not recall whether their credit card went out of sight during the transaction or were certain the credit card remained within their sight during the transaction is immaterial.

Fourth, the jury was entitled to disbelieve appellant's self-serving testimony at trial that the police coerced him into making a statement of confession and his testimony that, to the contrary, he had never seen a card scanning device in his life – and that he did not know who Dre was. See Sandoval v. Commonwealth, 20 Va. App. 133, 138, 455 S.E.2d 730, 732 (1995) (explaining that "[t]he credibility of the witnesses and the weight accorded the evidence are matters solely for the factfinder who has the opportunity to see and hear that evidence as it is presented"); Marable v. Commonwealth, 27 Va. App. 505, 509-10, 500 S.E.2d 233, 235 (1998) (stating that "[i]n its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt").

Thus, a rational trier of fact could find that appellant obtained the credit card numbers of his customers without their consent and, at least in four instances, used a card scanning device to obtain information related to the credit card.

### III. CONCLUSION

The trial court did not err when it admitted Exhibit 5F into evidence, as Exhibit 5F was non-testimonial, and it also fell within the business records exception to the hearsay rule. Moreover, viewing the evidence in the light most favorable to the Commonwealth, as we must since the Commonwealth prevailed below, the jury properly found appellant guilty of seven counts of credit card theft and four counts of unlawful use of a card scanning device or

re-encoder.  Accordingly, we affirm appellant's convictions for credit card theft under Code

§ 18.2-192 and unlawful use of a card scanning device or re-encoder under Code § 18.2-196.1.

<u>Affirmed.</u>